Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Nadia Udeshi, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees
Insurance Company, GEICO Indemnity Company,
GEICO General Insurance Company and
GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,                                    Docket No.: _____(      )

                              Plaintiffs,

          -against-


CAPLET PHARMACY INC.,
STANISLAV MASHEYEV, and
JOHN DOE DEFENDANTS "1" THROUGH "10,"

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants Caplet Pharmacy Inc., Stanislav

Masheyev, and John Doe Defendants "1" through "10" (collectively, the "Defendants"), hereby

allege as follows:

## NATURE OF THE ACTION

1.    This action seeks to terminate an ongoing fraudulent scheme spearheaded by the Defendants who exploited the New York "No-Fault" insurance system by submitting more than $1.4 million dollars in fraudulent billing to GEICO for pharmaceutical products allegedly dispensed to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds"). Specifically, the Defendants submitted, or caused to be submitted, hundreds of fraudulent bills with exorbitant charges for a set of specifically targeted, medically unnecessary "pain relieving" topical drug products, including topical pain gels, ointments and patches, primarily in the form of Lidothol Patches, LidoPro Patches, Lidocaine 5% Ointment and Lidocaine 5% Patches (collectively, the "Lidocaine Products"), Diclofenac Gel 3%, and Diclofenac Solution 1.5% (the "Diclofenac Products") (collectively, the "Fraudulent Topical Pain Products"), in addition to a limited assortment of other pharmaceutical products (together with the Fraudulent Topical Pain Products, the "Fraudulent Pharmaceuticals").

2.    Caplet Pharmacy Inc. ("Caplet Pharmacy"), and its owner, Stanislav Masheyev ("Masheyev") (together, the "Pharmacy Defendants"), purport to be a neighborhood pharmacy that lawfully billed and dispensed a variety of prescription drug products to patients, but Caplet Pharmacy, colluding with John Doe Defendants "1" through "10", focused on dispensing the Fraudulent Topical Pain Products, billed inflated charges for excessive and duplicative quantities of pharmaceutical products without regard for patient care, dispensed as prescription products pain patches that are classified by the U.S. Food and Drug Administration as "unapproved" or over-the-counter patches, and often submitted fraudulent delivery slips containing signatures purporting to be those of the Insureds to misled GEICO into believing that the Fraudulent Pharmaceuticals were actually delivered to the Insureds when they were not.

2

3.      To effectuate the fraudulent scheme, Caplet Pharmacy and its owner, Masheyev, entered into illegal, collusive agreements with prescribing healthcare providers (the "Prescribing Providers") and unlicensed laypersons (the "Clinic Controllers") who work at or are associated with various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics" or "Clinics"). Pursuant to these illegal, collusive agreements and to maximize profits, the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to prescribe and direct large volumes of prescriptions for the targeted Fraudulent Topical Pain Products to Caplet Pharmacy, in place of other effective, but much less costly prescription and non-prescription drug products.

4.      The scheme by the Pharmacy Defendants to steer the Prescribing Providers and Clinic Controllers to routinely prescribe large volumes of specifically targeted Fraudulent Pharmaceuticals to Insureds and route those prescriptions to Caplet Pharmacy egregiously inflated the charges submitted to GEICO. For example, billing from Caplet Pharmacy typically included charges of: (i) $1,311.29 for two boxes of 15 Lidothol Patches; (ii) $1,267.20 for two boxes of 15 LidoPro Patches, with some charges as high as $1,411.20; (iii) from $304.40 to $1,219.20 for a single tube of Lidocaine 5% Ointment, with several charges exceeding $1,500.00; (iv) $1,168.80 for a single prescription of Diclofenac Solution 1.5%; (v) $944.00 for a single tube of Diclofenac Gel 3%; (vi) $680.64 for two boxes of 30 Diclofenac Patches 1.3%; and (vii) from $224.64 to $741.60 for a single prescription of Lidocaine 5% Patches.

5.      By this action, GEICO seeks to recover more than $740,000.00 that the Pharmacy Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to Caplet Pharmacy of over $640,000.00 in pending fraudulent No-Fault claims for

the Fraudulent Pharmaceuticals that the Pharmacy Defendants submitted or caused to be submitted

through Caplet Pharmacy because:

(i)     The Pharmacy Defendants billed for pharmaceutical products that were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)    The Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Caplet Pharmacy in exchange for unlawful kickbacks and other financial incentives;

(iii)   The Pharmacy Defendants dispensed and billed for pharmaceutical products through Caplet Pharmacy – specifically Lidothol Patches and LidoPro Patches -- that were medically unnecessary and classified by the United States Food and Drug Associations ("FDA") as "unapproved" drugs or over the counter ("OTC") products that were sourced from an unregistered drug supplier in violation of New York pharmacy laws;

(iv)    The Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that Caplet Pharmacy dispensed in large volumes to Insureds at exorbitant charges, in place of other effective, less costly pharmaceuticals in order to inflate the charges to GEICO; and

(v)     The Pharmacy Defendants made false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals that were in many instances not actually delivered to the patients.

6.      The Defendants fall into the following categories:

(i)     Caplet Pharmacy is a New York corporation that engaged in a fraudulent scheme in which it dispensed the Fraudulent Pharmaceuticals in order to submit to GEICO and other New York automobile insurers claims for reimbursement of No-Fault Benefits to which it is not entitled;

(ii)    Masheyev is the purported owner of Caplet Pharmacy; and

(iii)   John Doe Defendants "1" through "10" are persons and entities presently not identifiable but who, along with the Pharmacy Defendants, participated in the fraudulent scheme by (i) assisting with the operation and control of Caplet Pharmacy and/or (ii) facilitating the illegal, collusive agreements with the Clinics and Prescribing Providers.

7.      The Defendants' scheme began in 2021. As discussed more fully below, the Defendants at all times have known that: (i) Caplet Pharmacy billed for pharmaceutical products that were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Caplet Pharmacy in exchange for unlawful kickbacks and other financial incentives; (iii) the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that Caplet Pharmacy dispensed in large volumes to Insureds at exorbitant charges, in place of other effective, less costly pharmaceuticals in order to inflate the charges to GEICO; (iv) Caplet Pharmacy dispensed and billed for purported pharmaceutical products – including Lidothol Patches and LidoPro Patches -- that were unnecessary and classified by the FDA as "unapproved" or OTC products, which were sourced from an unregistered drug supplier in violation of New York pharmacy laws; and (v) the Pharmacy Defendants made false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals charges for the Fraudulent Pharmaceuticals dispensed by Caplet Pharmacy that were in many instances not actually delivered to the patients.

8.      Based on the foregoing, Caplet Pharmacy does not now have – and has never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds. The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date which the Pharmacy Defendants submitted, or

caused to be submitted, to GEICO through Caplet Pharmacy using the United States mail. As a result of the Defendants' scheme, GEICO has incurred damages of more than $740,000.00.

## THE PARTIES

### I.    Plaintiffs

9.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland.  GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.   Defendants

10.      Defendant Caplet Pharmacy is a New York corporation, incorporated on or about May 24, 2021, with its principal place of business at 117-12 Queens Boulevard, Forest Hills, New York, 11375. Caplet Pharmacy was first registered with the New York State Education Department, Office of the Professions, on or about August 31, 2021.

11.      Defendant Masheyev resides in and is a citizen of New York. Masheyev is the purported owner of Caplet Pharmacy.

12.      Masheyev, as the purported owner of Caplet Pharmacy, is responsible for the proper conduct of the pharmacy, including its compliance with all licensing laws.

13.      Caplet Pharmacy and its owner Masheyev knowingly submitted fraudulent claims to GEICO for pharmaceuticals purportedly dispensed to GEICO Insureds.

14.      John Doe Defendants "1" through "10" reside in and are citizens of New York. John Doe Defendants "1" through "10" are persons and entities presently not identifiable but who, along with the Pharmacy Defendants, participated in the fraudulent scheme by (i) assisting with

the operation and control of Caplet Pharmacy and/or (ii) facilitating the illegal, collusive agreements with the Clinics and Prescribing Providers.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

16.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

17.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

18.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

I.     **An Overview of New York's No-Fault Laws**

19.     GEICO underwrites automobile insurance in the State of New York.

20.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 165 et seq.) (collectively referred to herein as the "No-Fault Laws"), automobile insurers are required

to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

21.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

22.     The No-Fault Laws limit reimbursement for benefits to prescription drugs only. Over-the-counter ("OTC") drugs and products which may be purchased without a prescription are not covered expenses under the No-Fault Laws.

23.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3"). In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

24.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

25.     The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

26.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005) and <u>Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.</u>, 33 N.Y.3d 389 (2019), the New York Court of

Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

27.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

**II.     An Overview of Applicable Pharmacy Licensing Laws**

28.     Pursuant to New York Education Law § 6808, no person, firm, corporation, or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

29.     Pursuant to 8 N.Y.C.R.R. § 29.7(a)(16), pharmacies in New York are prohibited from holding for sale or selling drugs that are not manufactured in accordance with the good manufacturing practices specified in Parts 210 and 211 of Title 21, Code of Federal Regulations.

30.     Pursuant to 8 N.Y.C.R.R. § 29.1, pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

31.     Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

32.     Pursuant to 8 N.Y.C.R.R. § 63.1(7), pharmacists shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to contraindications, therapeutic duplication, drug-drug interactions, including serious interactions with OTC drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

33.     New York Education Law § 6810 prohibits pharmacies from dispensing a drug when the prescription form for that drug includes any other drug. Separate prescriptions are required for each drug prescribed and dispensed.

34.     New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

35.     Pursuant to New York Education Law § 6512, § 6530(11), (18), and (19), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

36.     New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for financial gain of the licensee or of a third party.

37.     New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

38.     New York Education Law § 6509-a prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting or refunding of a fee in connection with professional care or services related to drugs and/or medications.

39.     Pursuant to New York Education Law § 6808(e), pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

40.     Pursuant to New York Education § 6808(e), pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

III.   **The Defendants' Scheme Involving The Fraudulent Pharmaceuticals**

A.     **Overview of the Scheme**

41.     Beginning in 2021 and continuing uninterrupted through the present day, the Defendants masterminded and implemented a fraudulent scheme in which they have used Caplet Pharmacy to exploit patients for financial gain by billing the New York automobile insurance industry for millions of dollars in inflated charges – which they were not eligible to receive – for the Fraudulent Pharmaceuticals purportedly dispensed to the Insureds.

42.     Caplet Pharmacy purports to be a storefront neighborhood pharmacy operating in Queens, New York, when in fact, it operates as a large-scale fraudulent scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the

prescribing and dispensing of the Fraudulent Pharmaceuticals, while intentionally disregarding a vast array of prescription and OTC medications readily available at a fraction of the cost.

43.     Unlike legitimate pharmacies dispensing a variety of pharmaceutical products, Caplet Pharmacy intentionally targeted a specific set of pharmaceuticals (i.e., the Fraudulent Topical Pain Products), which make up the majority of the billing that the Pharmacy Defendants submitted to GEICO for reimbursement.

44.     Specifically, Caplet Pharmacy submitted to GEICO approximately $1.4 million dollars in claims for reimbursement, of which almost $1 million was for the Fraudulent Topical Pain Products.

45.     In keeping with the fact that the Pharmacy Defendants targeted a specific and limited set of pharmaceuticals that enabled them to maximize their inflated charges to GEICO, Caplet Pharmacy routinely dispensed and billed for Lidothol Patches, LidoPro Patches, Lidocaine 5% Patches, Lidocaine 5% Ointment, Diclofenac Gel 3%, and Diclofenac Solution 1.5%.

46.     The Pharmacy Defendants chose these products – Lidothol Patches, LidoPro Patches, Lidocaine 5% Patches, Lidocaine 5% Ointment, Diclofenac Gel 3%, and Diclofenac Solution 1.5% – because they could acquire them at low cost and submit claims for reimbursement to GEICO at exorbitant prices after illegally steering prescriptions to themselves. Moreover, the Pharmacy Defendants knew that similar OTC products that could be recommended to Insureds were not covered under the No-Fault Laws.

47.     To inflate the Pharmacy Defendants' ill-gotten gains even further, the Pharmacy Defendants targeted cheap pain patches sourced from a drug supplier not registered with the New York State Department of Education, as required by law, and dispensed these products as prescription drugs even though the patches are not approved by the FDA (Lidothol Patches) and/or

are classified by the FDA as an OTC drug (LidoPro Patches).  In fact, the Pharmacy Defendants billed GEICO more than $280,000.00 for purported prescription drugs in the form of the unapproved Lidothol Patches and the OTC LidoPro Patches.

48.     Like the Lidothol Patches and the OTC LidoPro Patches, the other Fraudulent Topical Pain Products dispensed by Caplet Pharmacy primarily consisted of Lidocaine and Diclofenac products.  Not surprisingly, the U.S. Department of Health & Human Services, Office of Inspector General ("OIG") has raised concern about "potential fraud and abuse related to both diclofenac and lidocaine." See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

49.     In furtherance of the fraudulent scheme, the Pharmacy Defendants entered into illegal, collusive agreements with the Prescribing Providers and Clinic Controllers at the No-Fault Clinics in which the Pharmacy Defendants steered them to prescribe and direct large volumes of prescriptions to Caplet Pharmacy for specifically targeted Fraudulent Pharmaceuticals, which were purportedly prescribed and dispensed to patients treating at the No-Fault Clinics.

50.     In keeping with the fact that prescriptions were steered from the No-Fault Clinics without regard for genuine patient care, many of the No-Fault Clinics are known medical mills that house a "revolving door" of numerous healthcare providers who subject Insureds to as many healthcare goods and services as possible in order to exploit the Insureds' No-Fault Benefits by submitting large volumes of fraudulent claims to No-Fault insurers such as GEICO.

51.     The Pharmacy Defendants ensured that the Prescribing Providers and Clinic Controllers directed the prescriptions for the Fraudulent Pharmaceuticals to Caplet Pharmacy regardless of (i) the distance of the pharmacy to the Insureds' residences or the Prescribing

Providers' practices; and (ii) the fact that that there were countless other pharmacies located much closer to the Insureds' residences.

52.     Specifically, about 64% of the Insureds that allegedly received pharmaceuticals dispensed by Caplet Pharmacy lived outside of Queens, New York, where the pharmacy is located, with these Insureds' residences scattered throughout Brooklyn, Bronx, Manhattan, and Long Island, including Nassau County and Suffolk County.  In some instances, the Insureds' residences were located in cities and counties outside of New York, including New Jersey.

53.     But for the Pharmacy Defendants' illegal, collusive agreements with the Prescribing Providers and Clinic Controllers, the Insureds would not have received pharmaceutical products, to the extent they actually received any products at all, from a pharmacy that is located in a county or city outside of their place of residence.

54.     Instead, the Prescribing Providers and Clinic Controllers directed prescriptions for the Fraudulent Pharmaceuticals to Caplet Pharmacy, notwithstanding the pharmacy's inconvenient location to the Insureds' residences or the Prescribing Providers' practices, because the prescriptions were being issued and directed to Caplet Pharmacy pursuant to illegal, collusive agreements.

55.     Caplet Pharmacy, in exchange for the payment of kickbacks or other financial incentives, received medically unnecessary prescriptions from the Prescribing Providers and Clinic Controllers at the No-Fault Clinics pursuant to fraudulent predetermined protocols.

56.     The Pharmacy Defendants used the prescriptions obtained from the No-Fault Clinics to bill GEICO and other insurers for the Fraudulent Pharmaceuticals.

57.     While the Pharmacy Defendants obtained prescriptions and billed GEICO for the prescribed drug products, in many instances the Defendants did not bother to dispense the prescribed products or provide them to the Insureds.

58.     In keeping with the fact that many of the prescribed Fraudulent Pharmaceuticals were never provided to the Insureds, the Pharmacy Defendants often submitted fraudulent delivery slips containing signatures purporting to be those of the Insureds to mislead GEICO into believing that the Fraudulent Pharmaceuticals were actually delivered to the Insureds when they were not.

**B.      The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Regard to Genuine Patient Care to Exploit Patients for Financial Gain**

59.     In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, the Insureds treated by the Prescribing Providers at No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from Caplet Pharmacy – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacks in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

60.     Despite the basic goal to help patients get better in a timely manner, the treatment reports almost uniformly reflect that the Insureds do not get better, do not return to good health, and/or do not experience improvement in their conditions such that the Insureds can terminate medical treatment expeditiously and return to normal activity.

61.     Rather, as part of the predetermined protocol, the Prescribing Providers produced generic, and boilerplate examination reports designed to justify continued, voluminous and excessive healthcare services that the No-Fault Clinic providers purport to render to Insureds.

These healthcare services include the prescription of excessive amounts of medically unnecessary pharmaceutical drug products such as the Fraudulent Pharmaceuticals.

62.     Notwithstanding the creation of the examination reports, the Prescribing Providers' prescription of the Fraudulent Pharmaceuticals dispensed by Caplet Pharmacy was based on predetermined protocols designed to exploit the Insureds for financial gain, without regard to the genuine needs of the patients.

63.     To the extent any examination was actually performed at all, the Prescribing Providers virtually always failed to document a detailed medical history of the patients to whom they prescribed a multitude of Fraudulent Pharmaceuticals that were dispensed by Caplet Pharmacy.

64.     Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety as the Prescribing Providers often did not know whether the patient was taking any medication or suffering from any co-morbidity that would contraindicate the use of a particular prescribed drug product.

65.      The Prescribing Providers also virtually always failed to document in their examination reports whether the patients were intolerant of oral medications thereby necessitating a prescription for a Fraudulent Topical Pain Product.

66.     The Prescribing Providers also virtually always failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by Caplet Pharmacy were actually used by the patient.

67.     The Prescribing Providers also virtually always failed to document in their follow-up examinations whether the Fraudulent Pharmaceuticals dispensed by Caplet Pharmacy provided

any relief to the patient or whether the patient experienced any side effects associated with the prescribed pharmaceutical product.

>    **i.    Caplet Pharmacy Dispensed Hundreds of Thousands of Dollars in Pain Patches Not Approved by the FDA and/or Classified as OTC by the FDA and Sourced From an Illegitimate Supplier**

68.    In keeping with the fact that the Pharmacy Defendants targeted exorbitantly priced pharmaceuticals that were not medically necessary and were prescribed and dispensed pursuant to fraudulent predetermined treatment protocols and collusive agreements, the Pharmacy Defendants billed GEICO for hundreds of thousands of dollars in exorbitant charges for unapproved drugs and drugs classified as OTC drugs, which were sourced from an unregistered and non-accredited supplier.

69.    The United States Federal Food, Drug, and Cosmetic Act ("FDCA") authorizes the FDA to oversee the safety of food, drugs, and cosmetics.

70.    The FDA strictly regulates prescription drugs, and oversees drug manufacturing in several ways, including testing drugs and routinely inspecting drug manufacturing plants and outsourcing facilities engaged in the compounding of drugs.

71.    The FDA requires that every drug product, whether a brand name or generic, have a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged.

72.    Each NDC for a particular drug product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.

73.    The assignment of an NDC to a particular drug product does not indicate that the FDA has verified the information provided or that the products are FDA approved.

74.     Caplet Pharmacy has billed GEICO for purportedly dispensing to Insureds "Lidothol Patches" with NDC 53225102501 (containing Lidocaine 4.5% and Menthol 5%) and "LidoPro Patches" with NDC 53225102301 (containing Lidocaine 4%, Menthol 5%, and Methyl Salicylate 4%).

75.     The FDA classifies the Lidothol Patches billed by Caplet Pharmacy under NDC 53225102501 as an unapproved drug.

76.     The FDA classifies the LidoPro Patches billed by Caplet Pharmacy under NDC 53225102301 as an OTC drug that is not approved by the FDA.

77.     The No-Fault Laws limit reimbursement for benefits to medically necessary, prescription drugs only.

78.     Yet, Caplet Pharmacy has billed GEICO more than $280,000.00 for unapproved and OTC products in the form of the Lidothol Patches and LidoPro Patches, typically billing $1,311.29 for 30 Lidothol Patches and $1,267.20 for 30 LidoPro Patches.

79.     Furthermore, all Lidothol Patches billed by Caplet Pharmacy with assigned NDC 53225102501 and all LidoPro Patches billed by Caplet Pharmacy with assigned NDC 53225102301 were produced by, or sourced from, a single company, Terrain Pharmaceuticals.

80.     Terrain Pharmaceuticals is not a registered drug supplier, manufacturer, or wholesaler with the New York State Education Department, as required by the pharmacy laws, and therefore, is not legally permitted to dispense, retail, wholesale, manufacturer or offer drugs for sale.

81.     Despite the fact that Lidothol Patches and LidoPro Patches are unapproved drug products and/or OTC only – and sourced from an unregistered supplier -- the Prescribing Providers somehow purportedly prescribed hundreds of boxes of the Lidothol Patches and hundreds of boxes

of LidoPro Patches, repeatedly prescribed primarily through electronic prescriptions specifically identifying the particular patches by name.

82.     No legitimate Prescribing Provider would repeatedly prescribe a specific and unique drug product that has not been approved by the FDA and/or is classified as an OTC drug -- and which is uniquely sourced only from an unlicensed supplier – when there are numerous equivalent FDA approved products known to be safe and effective, typically available at a fraction of the cost.

83.     Notably, Caplet Pharmacy, as a pharmacy licensed in New York State, is prohibited from holding for sale or selling drugs that are sourced from drug suppliers not licensed in New York, as there is no way to ensure that the drugs were manufactured in accordance with the good manufacturing practices specified in Parts 210 and 211 of Title 21, Code of Federal Regulations.

84.     Further, in 2004, the National Association of Boards of Pharmacy ("NABP") established the Verified-Accredited Wholesale Distributors ("VAWD") process in order to ensure and maintain a secure medical supply chain of prescription drug products, among other things. The VAWD accreditation process plays a vital role in preventing counterfeit drugs from entering the US drug supply and thereby, protecting the public from contaminated, counterfeited, or diverted drug products.

85.     VAWD accreditation is a rigorous process. In order to receive VAWD accreditation, a drug wholesale company must meet several criteria including: (i) complying with all state and federal laws and regulations; (ii) maintaining a legitimate operation; (iii) keeping their license is in good standing; (iv) having security measures in place; and (v) employing best practices relating to the handling, storing and shipping prescription drug products.

86.     Caplet Pharmacy's purported owner, Masheyev, is responsible for the "proper conduct of the pharmacy" and "for the strength, quality, purity and the labeling thereof of all drugs," as specified in New York Education Law § 6808(e).

87.     Despite the availability of numerous properly licensed and VAWD accredited pharmaceutical suppliers in New York, the Pharmacy Defendants consciously purchased – and thereafter dispensed – unapproved LidoPro Patches and Lidothol Patches sourced from an unlicensed and non-accredited supplier, without any regard for the health and safety of patients.

88.     The FDA makes clear that unapproved drugs pose significant risks to patients because they have not been reviewed by the FDA for safety, effectiveness, or quality. Without FDA review, there is no way to know if these drugs are safe and effective for their intended use, whether they are manufactured in a way that ensures consistent drug quality, or whether their label is complete and accurate.

89.     By purchasing cheap, unapproved drugs and OTC drugs – and then dispensing those drugs in large volumes to Insureds – the Pharmacy Defendants endangered patients and violated material regulatory and licensing requirements imposed on pharmacies in New York, while generating huge profits from hundreds of thousands of dollars in fraudulent claims submitted to the New York automobile insurance industry.

90.     Furthermore, in accordance with the Defendants' fraudulent scheme, and to maximize profits, the Prescribing Providers routinely prescribed, and Caplet Pharmacy routinely dispensed, excessive quantities of Lidothol Patches or LidoPro Patches to a single patient, which egregiously inflated its fraudulent billing submitted to GEICO. For example:

> (i)     Insured JH was allegedly involved in a motor vehicle accident on September 5, 2019. The Pharmacy Defendants submitted more than $7,800.00 in fraudulent billing to GEICO for non-FDA approved Lidothol Patches purportedly dispensed to JH. Specifically, JH sought treatment with BL Pain Management

PLLC ("BL Pain Management") at a No-Fault Clinic located at 2044 Westchester Avenue, Bronx, New York. On March 16, 2022, JH underwent an initial examination with Boleslav Kosharskyy M.D. ("Dr. Kosharskyy"), and Elnoton Kurayev, N.P. ("NP Kurayev") issued an electronic prescription for 30 Lidothol Patches with no refills. On March 17, 2022, Caplet Pharmacy purportedly dispensed and billed GEICO for 30 Lidothol Patches pursuant to NP Kurayev's prescription. Thereafter, pursuant to three (3) additional electronic prescriptions, Caplet Pharmacy dispensed and billed GEICO for: (i) 30 Lidothol Patches on April 28, 2022; (ii) 90 Lidothol Patches on September 1, 2022; (iii) 30 Lidothol Patches on December 16, 2022; and (iv) 30 Lidothol Patches on January 12, 2023.

(ii)     Insured LV was allegedly involved in a motor vehicle accident on August 3, 2021. The Pharmacy Defendants submitted more than $5,200.00 in fraudulent billing to GEICO for non-FDA approved Lidothol Patches purportedly dispensed to LV. Specifically, LV sought treatment with BL Pain Management at a No-Fault Clinic located at 2044 Westchester Avenue, Bronx, New York. On November 9, 2021, LV underwent a follow-up examination with Yahya Shah, P.A. ("PA Shah"), who issued an electronic prescription for 60 Lidothol Patches with no refills. On November 11, 2021, Caplet Pharmacy dispensed and billed GEICO for 30 Lidothol Patches pursuant to PA Shah's prescription. Thereafter, pursuant to the same November 9, 2021 electronic prescription, Caplet Pharmacy dispensed and billed GEICO for an additional 30 Lidothol Patches on February 11, 2022. What is more, pursuant to an electronic prescription for 60 Lidothol Patches with no refills issued on December 7, 2021, Caplet Pharmacy dispensed and billed GEICO for 30 Lidothol Patches on December 10, 2021. Thereafter, pursuant to the same December 7, 2021 electronic prescription, Caplet Pharmacy dispensed and billed GEICO for an additional 30 Lidothol Patches on January 12, 2022.

(iii)    Insured KM was allegedly involved in a motor vehicle accident on October 16, 2021. The Pharmacy Defendants submitted more than $3,900.00 in fraudulent billing to GEICO for non-FDA approved Lidothol Patches purportedly dispensed to KM. Specifically, KM sought treatment with BL Pain Management at a No-Fault Clinic located at 2050 Eastchester Road, Bronx, New York. On December 13, 2021, KM underwent an initial examination with PA Shah, who issued an electronic prescription for 60 Lidothol Patches with no refills. On December 18, 2021, Caplet Pharmacy dispensed and billed GEICO for 30 Lidothol Patches pursuant to PA Shah's prescription. Thereafter, pursuant to the same December 13, 2021 electronic prescription, Caplet Pharmacy dispensed and billed GEICO for an additional 30 Lidothol Patches on January 19, 2022. What is more, pursuant to an additional electronic prescription for 30 Lidothol Patches with three (3) refills issued on April 11,

2022, Caplet Pharmacy dispensed and billed GEICO for 30 Lidothol Patches on April 14, 2022.

91.    Not only are these practices clearly part of a fraudulent scheme designed to maximize profit, but they also pose a risk to – and show a genuine disregard for – patient health and safety as these patches are non-FDA approved and have not been tested to ensure they are safe and effective for their intended use, or whether they were manufactured in a way that ensures consistent drug quality.

### ii.    The Billing and Dispensing of Fraudulent Topical Diclofenac and Lidocaine Ointment Prescriptions

92.    In accordance with the fraudulent scheme discussed above, Caplet Pharmacy also routinely billed GEICO for exorbitantly priced topical pain gels, ointments, and lotions, primarily in the form of Diclofenac Gel 3% and Diclofenac Solution 1.5% (together, "Topical Diclofenac") and Lidocaine 5% Ointment pursuant to duplicitous prescriptions solicited from the Prescribing Providers and Clinic Controllers in exchange for kickbacks and other financial incentives.

### a.    The Fraudulent Topical Diclofenac

93.    The Pharmacy Defendants solicited the Prescribing Providers and Clinic Controllers to provide them with voluminous prescriptions for Topical Diclofenac so the Pharmacy Defendants could bill for these pharmaceutical products at exorbitant charges, which egregiously inflated the charges submitted to GEICO and other New York No-Fault insurers.

94.    The FDA requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

95.    A "Black Box Warning" is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

96.     Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, including myocardial infarction and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

97.     Formulations containing 1% Diclofenac are typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet. It has not been proven effective for treating strains or sprains.

98.     Diclofenac Gel 3% – prescribed by the Prescribing Providers and dispensed by the Pharmacy Defendants – is only FDA approved to treat a skin condition known as actinic keratoses.

99.     Topical Diclofenac has no proven efficacy or safety in the treatment of musculoskeletal injuries, nor is the use of Topical Diclofenac to treat musculoskeletal injuries an accepted off-label use.

100.    Notwithstanding the most common and proper uses for Topical Diclofenac or the risks associated with drug, the Pharmacy Defendants steered the Prescribing Providers to prescribe diclofenac sodium in the form of Topical Diclofenac, who did so without documenting the need or reason for the prescriptions.

101.    In addition, the Prescribing Providers purported to prescribe the Topical Diclofenac while often also recommending that the patient continue the use of oral NSAIDs or simultaneously prescribed oral NSAIDs – such as Ibuprofen, Meloxicam, or  Naproxen – and other Fraudulent Pharmaceuticals including additional Fraudulent Topical Pain Products, such as Lidocaine 5% Ointment.

102.     Prescribing Topical Diclofenac while simultaneously prescribing or recommending a patient take oral NSAIDs constitutes therapeutic duplication.

103.     Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical NSAIDs (e.g., Naproxen and Diclofenac Sodium Gel 3%) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

104.     Each year in the United States, approximately 4.5 million ambulatory care visits and 100,000 deaths occur as a result of adverse drug reactions. A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication.  See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

105.     Despite the risks it posed to the Insureds' health and wellbeing, the Prescribing Providers consciously engaged in therapeutic duplication by prescribing, and the Pharmacy Defendants consciously engaged in therapeutic duplication by dispensing, Topical Diclofenac in conjunction with oral NSAIDs and/or other Fraudulent Topical Pain Products to numerous Insureds.

106.     By engaging in such therapeutic duplication, the Prescribing Providers and Pharmacy Defendants put patients at increased risk of serious cardiovascular and gastrointestinal events (without any additional therapeutic benefit) as the use of oral NSAIDs increases the "Black Box Warning" risks associated with diclofenac sodium.

107.     Moreover, in many instances, including those where the Defendants exposed Insureds to the risks associated with therapeutic duplication, the Prescribing Providers consciously prescribed – and the Pharmacy Defendants consciously dispensed – the much more costly extended

release ("ER") formulation of oral NSAIDs instead of their immediate release counterpart without apparent regard to the patients' tolerance for the ER formulation or individual risk for an adverse medical event.

108.    Indeed, no legitimate Prescribing Provider would repeatedly prescribe the ER formulation of an oral NSAID – especially in circumstances involving therapeutic duplication – without first conservatively treating the patient with the immediate release formulation for a period of time sufficient to evaluate the patient's tolerance for the medication.

109.    The Pharmacy Defendants nevertheless routinely dispensed and billed GEICO for Naproxen CR (Naproxen's extended release formulation) with a charge of $1,033.44 for a single prescription versus $85.44 for immediate release Naproxen.

110.    In keeping with the fact that the Pharmacy Defendants targeted a specific set of pharmaceuticals pursuant to predetermined and profit-driven treatment protocols, and collusive arrangements with the Prescribing Providers and Clinic Controllers, the Prescribing Providers regularly engaged in therapeutic duplication by issuing prescriptions for Topical Diclofenac in conjunction with other Fraudulent Topical Pain Products, and/or contemporaneously to other Fraudulent Pharmaceuticals, such as oral NSAIDs – including their ER counterparts – and/or muscle relaxants. For example:

     (i)    Insured DM was allegedly involved in a motor vehicle accident on December 16, 2021. Thereafter, DM sought treatment with Linden Orthopaedics, P.C. ("Linden Orthopaedics") at a No-Fault Clinic located at 102-34 Atlantic Avenue, Ozone Park, New York. Despite the inherent risks of therapeutic duplication, Andrew Miller, M.D. ("Dr. Miller") of Linden Orthopaedics prescribed both a topical and an oral NSAID in the form of Diclofenac Solution 1.5% and Meloxicam, which were dispensed and billed to GEICO by Caplet Pharmacy on: (i) February 22, 2022 pursuant to prescriptions issued on February 18, 2022; (ii) March 23, 2022 pursuant to prescriptions issued on March 22, 2022; and (iii) May 25, 2022 pursuant to prescriptions issued on May 25, 2022. DM was also prescribed and dispensed additional Fraudulent Pharmaceuticals in the form of Percocet, a combination opioid medication. In

total, the Pharmacy Defendants submitted more than $4,000.00 in fraudulent billing to GEICO for the Fraudulent Pharmaceuticals dispensed to DM.

(ii)     Insured MR was allegedly involved in a motor vehicle accident on April 21, 2021. Thereafter, MR sought treatment with Linden Orthopaedics at a No-Fault Clinic located at 1900B Ralph Avenue, Brooklyn, New York. Despite the inherent risks of therapeutic duplication, Dr. Miller of Linden Orthopaedics prescribed both a topical and an oral NSAID in the form of Diclofenac Solution 1.5% and Meloxicam which were dispensed and billed by Caplet Pharmacy on: (i) June 14, 2022 pursuant to prescriptions issued on June 13, 2022; and (ii) September 5, 2022 pursuant to prescriptions issued on September 5, 2022. MR was also prescribed and dispensed additional Fraudulent Pharmaceuticals in the form of Percocet, a combination opioid medication. In total, the Pharmacy Defendants submitted more than $2,600.00 in fraudulent billing to GEICO for the Fraudulent Pharmaceuticals dispensed to MR.

(iii)    Insured ET was allegedly involved in a motor vehicle accident on February 28, 2022. Thereafter, ET sought treatment with Linden Orthopaedics at a No-Fault Clinic located at 104-08 Roosevelt Avenue, Corona, New York. Despite the inherent risks of therapeutic duplication, Dr. Miller of Linden Orthopaedics prescribed both a topical and an oral NSAID in the form of Diclofenac Solution 1.5% and Meloxicam which were dispensed and billed by Caplet Pharmacy on: (i) September 2, 2022 pursuant to prescriptions issued on September 1, 2022; and (ii) October 10, 2022 pursuant to prescriptions issued on October 8, 2022. ET was also prescribed and dispensed additional Fraudulent Pharmaceuticals in the form of Percocet, a combination opioid medication. In total, the Pharmacy Defendants submitted more than $2,800.00 in fraudulent billing to GEICO for the Fraudulent Pharmaceuticals dispensed to ET.

(iv)    Insured AM was allegedly involved in a motor vehicle accident on October 16, 2022. Thereafter, AM sought treatment with LR Medical PLLC ("LR Medical") at a No-Fault Clinic located at 1900B Ralph Avenue, Brooklyn, New York. Despite the inherent risks of therapeutic duplication, Leonid Litovskiy, P.A. ("PA Litovskiy") of LR Medical prescribed both a topical and an oral NSAID in the form of Diclofenac Gel 3% and Meloxicam which were dispensed and billed by Caplet Pharmacy on November 3, 2022 pursuant to prescriptions issued on October 26, 2022. AM was also prescribed and dispensed additional Fraudulent Pharmaceuticals in the form of: (i) Diclofenac Solution 1.5%, a topical NSAID; (ii) Percocet, a combination opioid medication; and (iii) Tizanidine Hydrochloride, a muscle relaxant. In total, the Pharmacy Defendants submitted more than $2,400.00 in fraudulent billing to GEICO for the Fraudulent Pharmaceuticals dispensed to AM.

(v)     Insured ER was allegedly involved in a motor vehicle accident on May 10, 2022. Thereafter, ER sought treatment with Linden Orthopaedics located at 313 43rd Street, Brooklyn, New York. Despite the inherent risks of therapeutic

duplication, Dr. Miller of Linden Orthopaedics prescribed both a topical and an oral NSAID in the form of Diclofenac Solution 1.5% and Meloxicam which were dispensed and billed by Caplet Pharmacy on: (i) October 14, 2022 pursuant to prescriptions issued on October 13, 2022; and (ii) December 30, 2022 pursuant to prescriptions issued on December 29, 2022. ER was also prescribed and dispensed additional Fraudulent Pharmaceuticals in the form of Percocet, a combination opioid medication. In total, the Pharmacy Defendants submitted more than $2,600.00 in fraudulent billing to GEICO for the Fraudulent Pharmaceuticals dispensed to ER.

(vi)    Insured RP was allegedly involved in a motor vehicle accident on October 26, 2021. Thereafter, RP sought treatment with LR Medical at a No-Fault Clinic located at 107-04 Jamaica Avenue, Richmond Hill, New York. Despite the inherent risks of therapeutic duplication, Leonid Reyfman, M.D. ("Dr. Reyfman") of LR Medical prescribed both a topical and an oral NSAID in the form of Diclofenac Gel 3% and Naproxen CR which were dispensed and billed by Caplet Pharmacy on November 3, 2021 pursuant to prescriptions issued on November 1, 2021. RP was also prescribed and dispensed additional Fraudulent Pharmaceuticals in the form of: (i) Lidocaine 5% Patches; (ii) Lidothol Patches; (iii) Tizanidine Hydrochloride, a muscle relaxant; and (iv) Baclofen, a muscle relaxant. In total, the Pharmacy Defendants submitted more than $6,000.00 in fraudulent billing to GEICO for the Fraudulent Pharmaceuticals dispensed to RP.

(vii)   Insured TT was allegedly involved in a motor vehicle accident on December 10, 2021. Thereafter, TT sought treatment with Linden Orthopaedics at a No-Fault Clinic located at 313 43rd Street, Brooklyn, New York. Despite the inherent risks of therapeutic duplication, Dr. Miller of Linden Orthopaedics prescribed both a topical and an oral NSAID in the form of Diclofenac Solution 1.5% and Meloxicam which were dispensed and billed by Caplet Pharmacy on: (i) April 19, 2022 pursuant to prescriptions issued on April 16, 2022; and (ii) August 20, 2022 pursuant to prescriptions issued on August 19, 2022. TT was also prescribed and dispensed additional Fraudulent Pharmaceuticals in the form of Percocet, a combination opioid medication. In total, the Pharmacy Defendants submitted more than $2,600.00 in fraudulent billing to GEICO for the Fraudulent Pharmaceuticals dispensed to TT.

(viii)  Insured JA was allegedly involved in a motor vehicle accident on August 21, 2022. Thereafter, JA sought treatment with Central Park Physical Medicine, P.C. ("Central Park Medicine") at a No-Fault Clinic located at 700 Rockaway Turnpike, Lawrence, New York. Despite the inherent risks of therapeutic duplication, Reginald Derosena, P.A. ("PA Derosena") of Central Park Medicine prescribed both a topical and an oral NSAID in the form of Diclofenac Gel 3% and Naproxen CR which were dispensed and billed by Caplet Pharmacy on: (i) September 30, 2022 pursuant to prescriptions issued on September 26, 2022; and (ii) December 9, 2022 pursuant to prescriptions issued on November

28, 2022. In total, the Pharmacy Defendants submitted more than $3,900.00 in fraudulent billing to GEICO for the Fraudulent Pharmaceuticals dispensed to JA.

(ix)     Insured JT was allegedly involved in a motor vehicle accident on July 4, 2022. Thereafter, JT sought treatment with Linden Orthopaedics at a No-Fault Clinic located at 1900B Ralph Avenue, Brooklyn, New York. Despite the inherent risks of therapeutic duplication, Dr. Miller of Linden Orthopaedics prescribed both a topical and an oral NSAID in the form of Diclofenac Solution 1.5% and Meloxicam which were dispensed and billed by Caplet Pharmacy on February 17, 2023 pursuant to prescriptions issued on February 16, 2023. JT was also prescribed and dispensed additional Fraudulent Pharmaceuticals in the form of: (i) Lidocaine 5% Ointment; (ii) Cyclobenzaprine Hydrochloride, a muscle relaxant; (iii) Tizanidine Hydrochloride, a muscle relaxant; (iv) Naproxen, an oral NSAID; and (v) Percocet, a combination opioid medication. In total, the Pharmacy Defendants submitted more than $2,600.00 in fraudulent billing to GEICO for the Fraudulent Pharmaceuticals dispensed to JT.

(x)     Insured TB was allegedly involved in a motor vehicle accident on December 13, 2022. Thereafter, TB sought treatment with LR Medical at a No-Fault Clinic located at 1900B Ralph Avenue, Brooklyn, New York. Despite the inherent risks of therapeutic duplication, PA Litovskiy prescribed both a topical and an oral NSAID in the form of Diclofenac Gel 3% and Naproxen CR which were dispensed and billed by Caplet Pharmacy on December 24, 2022 pursuant to prescriptions issued on December 21, 2022. TB was also prescribed and dispensed additional Fraudulent Pharmaceuticals in the form of: (i) Diclofenac Solution 1.5%; (ii) Meloxicam, an oral NSAID; (iii) Cyclobenzaprine Hydrochloride, a muscle relaxant; and (iv) Percocet, a combination opioid. In total, the Pharmacy Defendants submitted more than $3,300.00 in fraudulent billing to GEICO for the Fraudulent Pharmaceuticals dispensed to TB.

111.    As evidenced by, among other things, the simultaneous and voluminous dispensing of pharmaceuticals, Topical Diclofenac was prescribed and dispensed pursuant to collusive arrangements and predetermined protocols, and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as OTC medications proven to have therapeutic effects and available at a fraction of the cost.

112.    In keeping with the fact that Topical Diclofenac was prescribed and dispensed pursuant to predetermined protocols and without regard for patient care and safety, the initial

examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the prescriptions.

113.    In further keeping with the fact that the Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports prepared by the Prescribing Providers virtually never addressed whether the Topical Diclofenac prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patient experienced any side effects.

114.    Further to the fact that the Defendants prescribed and dispensed the Fraudulent Topical Pain Products and other Fraudulent Pharmaceuticals without regard to genuine patient care is that the Insureds were routinely prescribed multiple – and often duplicative – medications by multiple healthcare providers which were dispensed by multiple pharmacies with no meaningful coordination of care between them. As a result, the Insureds were regularly dispensed multiples of the same medications and/or medications that subjected them to therapeutic duplication.

115.    The fact that that the Prescribing Providers failed to properly document the prescriptions for Topical Diclofenac and consider the effects of the multiple, often duplicative other medications prescribed further indicates that there was no legitimate medical reason for the excessive amounts of Topical Diclofenac dispensed by the Pharmacy Defendants, particularly given the potential for adverse health effects to the Insureds.

116.    Caplet Pharmacy typically billed GEICO $944.00 for a single tube of Diclofenac Gel 3%. To date, the Pharmacy Defendants have submitted – through Caplet Pharmacy – over $148,000.00 in claims seeking reimbursement for Diclofenac Gel 3%.

117.    Similarly, Caplet Pharmacy typically billed GEICO $1,168.80 for a single tube of Diclofenac Solution 1.5%. To-date, the Pharmacy Defendants have submitted – through Caplet Pharmacy – approximately $300,000.00 in claims seeking reimbursement for Diclofenac Solution 1.5%.

b.   The Fraudulent Topical Lidocaine Ointment

118.    In addition to the excessive amounts of Topical Diclofenac dispensed by Caplet Pharmacy, the Pharmacy Defendants routinely billed GEICO – through Caplet Pharmacy – for exorbitantly priced topical Lidocaine 5% Ointment pursuant to prescriptions solicited from the Prescribing Providers and Clinic Controllers in exchange for kickbacks or other financial incentives.

119.    Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the body. Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections. Notably, Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

120.    Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects, including, among others, confusion, dizziness, tremors, convulsions, respiratory depression, bradycardia, hypertension, and cardiovascular collapse that may lead to cardiac arrest.  Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

121.    Further, even to the extent that topical lidocaine ointment is effective for treating certain specific conditions, the Lidocaine 5% Ointment dispensed by the Pharmacy Defendants is

only marginally stronger or more effective than 4% lidocaine, which is available over the counter and available at a fraction of the cost.

122.    Rather than provide more conservative, cost-effective treatment, the Prescribing Providers, pursuant to their collusive agreements with the Pharmacy Defendants and in order to exploit the Insureds for financial gain, virtually never directed the Insureds to try OTC 4% lidocaine – such as Icy Hot Lidocaine or other similar OTC lidocaine products readily available at well-known pharmacy retailers -- prior to prescribing the Lidocaine 5% Ointment.

123.    The Prescribing Providers never recommended Insureds first use OTC Lidocaine products to treat any minor aches and pain which they sustained in fender-bender type motor vehicles accidents because they were engaged in collusive arrangements and predetermined protocols with the Pharmacy Defendants and instead caused the prescription of Lidocaine 5% Ointment and directed those prescriptions to Caplet Pharmacy.

124.    As with the prescriptions for Topical Diclofenac, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the Lidocaine 5% Ointment prescriptions.

125.    Likewise, the follow-up examination reports virtually never addressed whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

126.    In accordance with the Defendants' fraudulent scheme, and to maximize profits, the Prescribing Providers often prescribed, and Caplet Pharmacy often dispensed Lidocaine 5% Ointment and/or other Lidocaine Products contemporaneously to other Fraudulent

Pharmaceuticals, including other Fraudulent Topical Pain Products such as Topical Diclofenac.

For example:

(i)     Insured JH was allegedly involved in a motor vehicle accident on September 5, 2019. Thereafter, JH sought treatment with BL Pain Management at a No-Fault Clinic located at 2044 Westchester Avenue, Bronx, New York. Zulay Guerrero Depoll, P.A. ("PA Depoll") and Alexander Niyazov, P.A. ("PA Niyazov") of BL Pain Management prescribed Lidocaine 5% Ointment, Lidothol Patches, Meloxicam, and Cyclobenzaprine Hydrochloride, which were dispensed and billed by Caplet Pharmacy on December 15, 2022. JH was also prescribed and dispensed additional Fraudulent Pharmaceuticals in the form of: (i) Nabumetone; (ii) Ibuprofen; (iii) Naproxen; and (iv) Baclofen. In total, the Pharmacy Defendants submitted more than $9,800.00 in fraudulent billing to GEICO for the Fraudulent Pharmaceuticals dispensed to JH.

(ii)    Insured YF was allegedly involved in a motor vehicle accident on March 16, 2022. Thereafter, YF sought treatment with Mount Hollis Medical, P.C. ("Mount Hollis Medical") at a No-Fault Clinic located at 148-43 Hillside Avenue, Jamaica, New York. PA Derosena of Mount Hollis Medical prescribed Lidocaine 5% Ointment and Diclofenac Gel 3%, which were dispensed and billed by Caplet Pharmacy on June 16, 2022. YF was also prescribed and dispensed additional Fraudulent Pharmaceuticals in the form of: (i) Celecoxib; and (ii) Cyclobenzaprine. In total, the Pharmacy Defendants submitted more than $4,000.00 in fraudulent billing to GEICO for the Fraudulent Pharmaceuticals dispensed to YF.

(iii)   Insured CG was allegedly involved in a motor vehicle accident on November 13, 2021. Thereafter, CG sought treatment with Colin Clarke, M.D., P.C. at a No-Fault Clinic located at 900B East Tremont Avenue, Bronx, New York. Colin Clarke, M.D. ("Dr. Clarke") of Colin Clarke, M.D., P.C. prescribed Lidocaine 5% Patches and Diclofenac Gel 3%, which were dispensed and billed by Caplet Pharmacy on February 23, 2022 and June 4, 2022. CG was also prescribed and dispensed additional Fraudulent Pharmaceuticals in the form of Ibuprofen. In total, the Pharmacy Defendants submitted more than $3,500.00 in fraudulent billing to GEICO for the Fraudulent Pharmaceuticals dispensed to CG.

(iv)    Insured ND was allegedly involved in a motor vehicle accident on July 29, 2020. Thereafter, ND sought treatment with Colin Clarke, M.D., P.C. at a No-Fault Clinic located at 900B East Tremont Avenue, Bronx, New York. Dr. Clarke of Colin Clarke, M.D., P.C. prescribed Lidocaine 5% Patches and Diclofenac Gel 3%, which were dispensed and billed by Caplet Pharmacy on February 18, 2022 and March 29, 2022. ND was also prescribed and dispensed additional Fraudulent Pharmaceuticals in the form of Methylprednisolone. In

total, the Pharmacy Defendants submitted more than $3,300.00 in fraudulent billing to GEICO for the Fraudulent Pharmaceuticals dispensed to ND.

(v)     Insured YV was allegedly involved in a motor vehicle accident on June 14, 2022. Thereafter, YV sought treatment with Colin Clarke, M.D., P.C. at a No-Fault Clinic located at 164-10 Crocheron Avenue, Flushing, New York. Dr. Clarke of Colin Clarke, M.D., P.C. prescribed Lidocaine 5% Patches and Diclofenac Gel 3%, which were dispensed and billed by Caplet Pharmacy on June 29, 2022. YV was also prescribed and dispensed additional Fraudulent Pharmaceuticals in the form of Tizanidine Hydrochloride. In total, the Pharmacy Defendants submitted more than $2,600.00 in fraudulent billing to GEICO for the Fraudulent Pharmaceuticals dispensed to YV.

(vi)    Insured FV was allegedly involved in a motor vehicle accident on August 5, 2020. Thereafter, FV sought treatment with Colin Clarke, M.D., P.C. at a No-Fault Clinic located at 3626 East Tremont Avenue, Bronx, New York. Dr. Clarke of Colin Clarke, M.D., P.C. prescribed Lidocaine 5% Ointment and Diclofenac Patches 1.3%, which were dispensed and billed by Caplet Pharmacy on May 26, 2022. In total, the Pharmacy Defendants submitted more than $1,800.00 in fraudulent billing to GEICO for the Fraudulent Pharmaceuticals dispensed to FV.

(vii)   Insured AM was allegedly involved in a motor vehicle accident on December 18, 2021. Thereafter, AM sought treatment with Metropolitan Medical and Surgical, P.C. ("Metropolitan Medical") at a No-Fault Clinic located at 32-56 Steinway Street, Astoria, New York. Cristy Perdue, M.D. ("Dr. Perdue") of Metropolitan Medical prescribed Lidocaine 5% Ointment and Lidothol 5% Patches, which were dispensed and billed by Caplet Pharmacy on July 22, 2022. AM was also prescribed and dispensed additional Fraudulent Pharmaceuticals in the form of: (i) Gabapentin; and (ii) Cyclobenzaprine Hydrochloride. In total, the Pharmacy Defendants submitted more than $1,700.00 in fraudulent billing to GEICO for the Fraudulent Pharmaceuticals dispensed to AM.

(viii)  Insured LR was allegedly involved in a motor vehicle accident on March 7, 2022. Thereafter, LR sought treatment with Colin Clarke, M.D., P.C. at a No-Fault Clinic located at 900B East Tremont Avenue, Bronx, New York. Dr. Clarke of Colin Clarke, M.D., P.C. prescribed Lidocaine 5% Patches and Diclofenac Gel 3%, which were dispensed and billed by Caplet Pharmacy on March 15, 2022. In total, the Pharmacy Defendants submitted more than $1,300.00 in fraudulent billing to GEICO for the Fraudulent Pharmaceuticals dispensed to LR.

(ix)    Insured FC was allegedly involved in a motor vehicle accident on July 5, 2021. Thereafter, FC sought treatment with Colin Clarke, M.D., P.C. at a No-Fault Clinic located at 900B East Tremont Avenue, Bronx, New York. Dr. Clarke of Colin Clarke, M.D., P.C. prescribed Lidocaine 5% Patches and Diclofenac Gel

3%, which were dispensed and billed by Caplet Pharmacy on February 19, 2022. In total, the Pharmacy Defendants submitted more than $1,100.00 in fraudulent billing to GEICO for the Fraudulent Pharmaceuticals dispensed to FC.

127.    At times, the Pharmacy Defendants also dispensed and billed GEICO for exorbitantly-priced Lidocaine 5% Patches, despite the availability of less expensive, commercially available FDA-approved patches.

128.    Notably, topical pain patches in which the primary ingredient is lidocaine are mainly used to treat chronic post-herpetic neuropathic pain (i.e., continued nerve pain after a patient recovers from shingles), although studies have shown that any relief these patches provide – beyond topical anesthetic relief – is more attributable to its placebo effect rather than the pharmacological action of patches themselves.  In fact, while the application of pain patches in which the primary ingredient is lidocaine provides sufficient absorption to cause an anesthetic effect, it is insufficient to produce a complete sensory block.

129.    Nevertheless, the Prescribing Providers prescribed the Lidocaine 5% Patches to Insureds for sprain/strain injuries sustained in fender-bender type motor vehicle accidents.

130.    The Pharmacy Defendants typically charged between $304.40 and $1,524.00 for a single tube of Lidocaine 5% Ointment, and between $224.64 and $741.60 for a prescription of Lidocaine 5% Patches. To-date, the Pharmacy Defendants have submitted – through Caplet Pharmacy – over $245,882.84 in claims seeking reimbursement for Lidocaine 5% Ointment and Lidocaine 5% Patches.

131.    Moreover, at times the Prescribing Providers prescribed and the Pharmacy Defendants dispensed the Topical Pain Products contemporaneous to muscle relaxants such as Cyclobenzaprine.

132.    In accordance with best practices, a prescription for a seven to ten day supply of Cyclobenzaprine may be appropriate during the *acute* stages of injury.  However, the Prescribing Providers often prescribed, and the Pharmacy Defendants dispensed, 30-day supplies of Cyclobenzaprine and at times such prescriptions were issued well past the acute stages of injury. For example:

(i)      Insured DD was allegedly involved in a motor vehicle accident on November 13, 2020. Thereafter, DD sought treatment with Queens Arthroscopy & Sports Medicine ("Queens Arthroscopy") at a No-Fault Clinic located at 62-54 97th Place, Rego Park, New York. DD underwent an examination with Laxmidhar Diwan, M.D. ("Dr. Diwan") who issued a prescription for a 30-day supply of Cyclobenzaprine on December 17, 2021, *more than one year* after the accident occurred. On December 21, 2021, Caplet Pharmacy dispensed Cyclobenzaprine to DD pursuant to the prescription from Dr. Diwan.

(ii)     Insured JP was allegedly involved in a motor vehicle accident on November 18, 2021. Thereafter, JP sought treatment with Pain Physicians NY at a No-Fault Clinic located at 780 Eighth Avenue, New York, New York. JP underwent an examination with PA Malik who issued a prescription for a 90-day supply of Cyclobenzaprine on January 11, 2023, *more than one year* after the accident occurred. On January 19, 2023, Caplet Pharmacy dispensed Cyclobenzaprine to JP pursuant to the prescription from PA Malik.

(iii)    Insured JH was allegedly involved in a motor vehicle accident on September 5, 2019. Thereafter, JH sought treatment with BL Pain Management at a No-Fault Clinic located at 2044 Westchester Avenue, Bronx, New York. JH underwent an examination with PA Niyazov who issued a prescription for a 30-day supply of Cyclobenzaprine on January 4, 2023, *more than one year* after the accident occurred. On January 12, 2023, Caplet Pharmacy dispensed Cyclobenzaprine to JH pursuant to the prescription from PA Niyazov.

(iv)     Insured EC was allegedly involved in a motor vehicle accident on November 13, 2021. Thereafter, EC sought treatment with Jordan Fersel, M.D., P.C. at a No-Fault Clinic located at 900B East Tremont Avenue, New York, New York. EC underwent an examination with Joseph Nagy, P.A. ("PA Nagy") who issued a prescription for a 60-day supply of Cyclobenzaprine on November 9, 2022, *approximately one year* after the accident occurred. On November 12, 2022, Caplet Pharmacy dispensed Cyclobenzaprine to EC pursuant to the prescription from PA Nagy.

(v)      Insured FS was allegedly involved in a motor vehicle accident on April 30, 2021. Thereafter, FS sought treatment with Bowen, M.D. PLLC at a No-Fault

Clinic located at 86-01 101 Avenue, Ozone Park, New York. FS underwent an examination with Andrew Bowen, M.D. ("Dr. Bowen") who issued a prescription for a 30-day supply of Cyclobenzaprine on March 25, 2022, *nearly one year* after the accident occurred. On March 25, 2022, Caplet Pharmacy dispensed Cyclobenzaprine to FS pursuant to the prescription from Dr. Bowen.

### iii.   The Fraudulent Delivery Slips

133.   In keeping with the fact that the Fraudulent Pharmaceuticals dispensed by the Pharmacy Defendants were prescribed pursuant to collusive arrangements and predetermined protocols rather than genuine patient care, in many instances the Defendants did not bother to dispense the prescribed Fraudulent Pharmaceuticals or provide them to the Insureds.

134.   Specifically, the Pharmacy Defendants often submitted fraudulent delivery slips containing signatures purporting to be those of the Insureds to mislead GEICO into believing that the Fraudulent Pharmaceuticals were actually delivered to the Insureds when they were not. For example:

> (i)   Insured ML was allegedly involved in a motor vehicle accident on August 26, 2021. Thereafter, ML sought treatment with Dr. Diwan at Queens Arthroscopy located at 62-54 97th Place, Rego Park, New York. Dr. Diwan issued prescriptions for Mobic and Lidoderm 5% Patches on December 3, 2021. Thereafter, Caplet Pharmacy purported to deliver the Fraudulent Pharmaceuticals pursuant to the prescriptions issued by Dr. Diwan to ML at ML's residence on December 8, 2021. The delivery slip submitted by Caplet Pharmacy with its billing to GEICO contained a signature purporting to be that of ML, but that did not match ML's signatures on ML's New York State Application for Motor Vehicle No-Fault Benefits (an "NF-2") signed on September 21, 2021.

> *Caplet Pharmacy Delivery Slip purportedly signed by ML:*

> I certify that I requested and received my medication listed above from CAPLET PHARMACY INC located at 11712 Queens Boulevard, Forest Hills, NY 11375 (the "Pharmacy"). I further certify that I had a patient relationship with the ordering medical provider indicated on the prescription label and that I requested that the prescriber send this prescription to the Pharmacy. The foregoing is certified as true and accurate under the penalty of perjury.
>
> Receiver's Name:                              Date: 12/08/2021
> Receiver's Signature:                         Time: 06:29 PM
>                                               Delivered By: ivan r

*NF-2 containing ML's actual signature:*



(ii)   Insured MC was allegedly involved in a motor vehicle accident on November 14, 2021. Thereafter, MC sought treatment with Dr. Diwan at Queens Arthroscopy located at 62-54 97th Place, Rego Park, New York. Dr. Diwan issued a prescription for Diclofenac Gel 3% on December 9, 2021. Thereafter, Caplet Pharmacy purported to deliver the Fraudulent Pharmaceutical pursuant to the prescription issued by Dr. Diwan to MC at MC's residence on December 14, 2021. The delivery slip submitted by Caplet Pharmacy with its billing to GEICO contained a signature purporting to be that of MC, but that did not match MC's signatures on MC's NF-2 signed on November 24, 2021.

*Caplet Pharmacy Delivery Slip purportedly signed by MC:*

*NF-2 containing MC's actual signature:*







(iii)   Insured NW was allegedly involved in a motor vehicle accident on April 11, 2022. Thereafter, NW sought treatment with Dr. Diwan at Queens Arthroscopy located at 62-54 97th Place, Rego Park, New York. Dr. Diwan issued a prescription for Diclofenac Patches 1.3%, on October 9, 2022. Thereafter, Caplet Pharmacy purported to deliver the Fraudulent Pharmaceutical pursuant to the prescription issued by Dr. Diwan to NW at NW's residence on October 10, 2022. The delivery slip submitted by Caplet Pharmacy with its billing to GEICO contained a signature purporting to be that of NW, but that did not match NW's signatures on NW's NF-2 signed on April 18, 2022.

*Caplet Pharmacy Delivery Slip purportedly signed by NW:*

I certify that I requested and received my medication listed above from CAPLET PHARMACY INC located at 11712 Queens Boulevard, Forest Hills, NY 11375 (the "Pharmacy"). I further certify that I had a patient relationship with the ordering medical provider indicated on the prescription label and that I requested that the prescriber send this prescription to the Pharmacy. The foregoing is certified as true and accurate under the penalty of perjury.

Receiver's Name: ████████                      Date: 10/11/2022

Receiver's Signature:                           Time: 10:11 AM



Delivered By: Ling Feng Z

*NF-2 containing NW's actual signature:*



(iv)     Insured KJ was allegedly involved in a motor vehicle accident on January 28, 2022. Thereafter, KJ sought treatment with Aleksandr Khaimov, D.O. ("Dr. Khaimov") at Quality Orthopedics & Complete Joint Care, P.C. located at 96-14 Metropolitan Avenue, 2nd Floor, Forest Hills, New York. Dr. Khaimov issued prescriptions for Ondansetron HCl, Naprelan CR, and Percocet on May 11, 2022. Thereafter, Caplet Pharmacy purported to deliver the Fraudulent Pharmaceuticals pursuant to the prescriptions issued by Dr. Khaimov to KJ at KJ's residence on May 12, 2022. The delivery slip submitted by Caplet Pharmacy with its billing to GEICO contained a signature purporting to be that

of KJ, but that did not match KJ's signatures on KJ's NF-2 signed on February 4, 2022.

*Caplet Pharmacy Delivery Slip purportedly signed by KJ:*



*NF-2 containing KJ's actual signature:*



(v)     Insured CS was allegedly involved in a motor vehicle accident on April 26, 2022. Thereafter, CS sought treatment with Shoirakhon Bakieva, M.D. ("Dr. Bakieva") at Be Evergreen Medical P.C. located at 102-05 Northern Boulevard, Corona, New York. Dr. Bakieva issued prescriptions for Ibuprofen and Cyclobenzaprine on April 27, 2022. Thereafter, Caplet Pharmacy purported to deliver the Fraudulent Pharmaceuticals pursuant to the prescriptions issued by Dr. Bakieva to CS at CS's residence on April 29, 2022. The delivery slip submitted by Caplet Pharmacy with its billing to GEICO contained a signature

purporting to be that of CS, but that did not match CS's signatures on CS's NF-2 signed on April 27, 2022.

*Caplet Pharmacy Delivery Slip purportedly signed by CS:*



*NF-2 containing CS's actual signature:*

135.   Plainly, in keeping with the Defendants' fraudulent scheme, the Pharmacy

Defendants did not even bother to deliver many of the Fraudulent Pharmaceuticals to the Insureds,

instead submitting fraudulent delivery slips containing false or forged signatures in order to

mislead GEICO into believing that the Fraudulent Pharmaceuticals were actually delivered to the Insureds when they were not.

C.   **The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Among the Pharmacy Defendants, Prescribing Providers and Clinic Controllers**

136.   To effectuate the fraudulent scheme, the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to Caplet Pharmacy for large volumes of the specifically targeted Fraudulent Pharmaceuticals pursuant to their collusive arrangements, which egregiously inflated the charges submitted to GEICO.

137.   New York's statutory framework provides, among other things, that pharmacies and licensed medication professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

138.   Here, the Pharmacy Defendants colluded with Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, which treat hundreds of Insureds, to have the Prescribing Providers prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and then have those prescriptions directed to Caplet Pharmacy so that the Pharmacy Defendants could bill GEICO for huge sums.

139.   The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of No-Fault Clinics, while the Pharmacy Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were

involved in illegal, collusive arrangements designed to exploit the patients for financial gain; the Fraudulent Pharmaceuticals were often being prescribed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were often being prescribed with gross indifference to patient health, care and safety; the Fraudulent Topical Pain Products were prescribed as a matter of course without any recommendation that patients first try OTC products; and that the Fraudulent Pharmaceuticals were prescribed without attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

140.    The Pharmacy Defendants dispensed and billed for the Fraudulent Pharmaceuticals pursuant to large volumes of prescriptions purportedly issued by the Prescribing Providers, notwithstanding that in many instances, there were countless other pharmacies located much closer to the patients' residences.

141.    In many cases, Caplet Pharmacy purported to mail or deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes without the patient even knowing that they were to receive a Fraudulent Pharmaceutical, to the extent the deliveries were even actually made.

142.    Alternatively, Insureds were given the Fraudulent Pharmaceuticals dispensed by Caplet Pharmacy directly from the front desk staff at the various No-Fault Clinics, again without ever even knowing that they were to receive a Fraudulent Pharmaceutical.

143.    The Prescribing Providers and Clinic Controllers supplied the Pharmacy Defendants with voluminous prescriptions for the Fraudulent Pharmaceuticals.

144.    The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

145.    The Pharmacy Defendants had no legitimate reason to dispense, or purport to dispense, the Fraudulent Pharmaceuticals that were (i) often prescribed and dispensed without regard to pharmacologic outcomes; (ii) prescribed and dispensed with gross indifference to patient health, care, and safety; (iii) prescribed and dispensed as a matter of course without any recommendation that patients first try OTC products; and (iv) prescribed and dispensed without any attention to cost and fiscal responsibility, because, among other things, all pharmacists in New York are required to conduct a prospective drug review before each prescription is dispensed, which review shall include screening for contraindications, therapeutic duplication, drug-drug interactions, including serious interactions with OTC drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

146.    The Prescribing Providers and Clinic Controllers would not have engaged in the illegal, collusive arrangements with the Pharmacy Defendants in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to Caplet Pharmacy, unless they profited from their participation in the illegal scheme either by way of direct kickbacks or other financial incentives, such as employment at a No-Fault Clinic.

147.    But for the payment of kickbacks, or other financial incentives from the Pharmacy Defendants, the Prescribing Providers would not have prescribed the Fraudulent Topical Pain Products, or the volume of the other Fraudulent Pharmaceuticals, and the Prescribing Providers and Clinic Controllers would not have directed the prescriptions to Caplet Pharmacy.

148.    The Pharmacy Defendants, Prescribing Providers, and Clinic Controllers have affirmatively concealed the amounts paid for the kickbacks because such kickbacks are in violation of New York law.

149.     Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Pharmacy Defendants paid, and continue to pay, a financial kickback or provide other financial incentives, and the Prescribing Providers and Clinic Controllers received, and continue to receive, a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that are dispensed by Caplet Pharmacy.

150.     Upon information and belief, the payment of such kickbacks was made at or near the time the prescriptions were issued.

## IV.   The Fraudulent Billing the Pharmacy Defendants Submitted or Caused to be Submitted to GEICO

151.     Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged. Each NDC number has an assigned Average Wholesale Price ("AWP").

152.     Each NDC (and, thus, the AWP) for a particular drug product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

153.     Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee Schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

154.     For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

155.    The Pharmacy Defendants solicited the Prescribing Providers and Clinic Controllers to provide them with voluminous prescriptions for the targeted Fraudulent Pharmaceuticals (i.e., the Fraudulent Topical Pain Products) so they could bill GEICO and other New York No-Fault insurers for the exorbitantly priced pharmaceutical products.

156.    The Pharmacy Defendants intentionally targeted the Fraudulent Topical Pain Products with extremely expensive assigned AWPs or "list prices", in order to inflate the billing submitted through Caplet Pharmacy so as to maximize their profits.

157.    Caplet Pharmacy never actually paid the targeted and egregious AWP of the Fraudulent Pharmaceuticals that it dispensed, or purported to dispense, because it is not a true representation of the actual market price and is far above the actual acquisition cost for the Fraudulent Pharmaceuticals.

158.    Nevertheless, the Pharmacy Defendants billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of a wide variety of other medications that are FDA-approved and proven effective, as part of the Defendants' scheme to target the Fraudulent Pharmaceuticals without regard for genuine patient care.

## V.    The Pharmacy Defendants' Submission of Fraudulent NF-3 Forms to GEICO

159.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits have been submitted to GEICO by and on behalf of Caplet Pharmacy seeking payment for the pharmaceuticals for which Caplet Pharmacy is ineligible to receive payment.

160.    These forms, including NF-3 forms, HCFA-1500 forms and other supporting records that the Pharmacy Defendants submitted or caused to be submitted to GEICO, are false and misleading in the following material respects:

        i.    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically

necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care;

ii.   The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Pharmacy Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Pharmacy Defendants did not comply with all material licensing requirements in that the Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Caplet Pharmacy in exchange for unlawful kickbacks and other financial incentives;

iii.   The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Pharmacy Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Pharmacy Defendants did not comply with all material licensing requirements in that the Pharmacy Defendants intentionally dispensed and billed for pharmaceutical products (i.e., Lidothol Patches and LidoPro Patches) that were unnecessary, not approved by the FDA and/or classified as OTC, and which were illegally sourced from an unregistered drug supplier in violation of New York pharmacy laws;

iv.   The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Pharmacy Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Pharmacy Defendants did not comply with all material licensing requirements in that the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that Caplet Pharmacy dispensed in large volumes to Insureds at exorbitant charges, in place of other effective, less costly pharmaceuticals in order to inflate the charges to GEICO; and

v.   The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Pharmacy Defendants were in compliance with all material licensing requirements and that the Fraudulent Pharmaceuticals were medically necessary and dispensed to the patient for genuine patient care.  In fact, the Pharmacy Defendants did not comply with all material licensing requirements in that they Pharmacy Defendants made false and fraudulent misrepresentations to GEICO by submitting or causing to be

submitted charges for the Fraudulent that were in many instances not actually delivered to the patients.

## VI.    The Pharmacy Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

161.    The Pharmacy Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for those products.

162.    To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Pharmacy Defendants have gone to great lengths to systematically conceal their fraud.

163.    Specifically, the Pharmacy Defendants knowingly have misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Pharmacy Defendants were involved in collusive kickback arrangements with the Prescribing Providers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing to GEICO and other New York insurance companies; and (iii) the Pharmacy Defendants illegally dispensed and billed for unapproved drugs or OTC drugs sourced from wholesalers and suppliers not registered in New York.

164.    The Pharmacy Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribing Providers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single licensee, and further billed for multiple drug products, including oral medications, in order to conceal the scheme to exploit the Insureds for financial gain.

165.    The billing and supporting documentation submitted by the Pharmacy Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, does not reveal its fraudulent nature.

166.    The Pharmacy Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full. In fact, the Pharmacy Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that Caplet Pharmacy has been engaged in fraud.

167.    The Pharmacy Defendants' collection efforts through numerous, separate no-fault collection proceedings is an essential part of their fraudulent scheme since they know it is impractical for a no-fault arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale, complex fraud scheme involving the prescription and dispensing of fraudulent pharmaceuticals to patients across numerous different No-Fault Clinics.

168.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. GEICO also ensures that No-Fault claim denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner.

169.    The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $740,000.00 representing payments made by GEICO based upon the fraudulent charges submitted by the Pharmacy Defendants, which damages are to be trebled under 18 U.S.C. § 1962(c)), et al. to approximately $2,220,000.00.

170.     Based upon the Pharmacy Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## THE FIRST CLAIM FOR RELIEF
### Against Caplet Pharmacy and Masheyev
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

171.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

172.     There is an actual case in controversy between GEICO and the Pharmacy Defendants regarding approximately $640,000.00 in fraudulent billing for the Fraudulent Pharmaceuticals that the Pharmacy Defendants submitted or caused to be submitted to GEICO through Caplet Pharmacy.

173.     Caplet Pharmacy has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because Caplet Pharmacy billed for pharmaceutical products that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care.

174.     Caplet Pharmacy has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Pharmacy Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Caplet Pharmacy in exchange for unlawful kickbacks and other financial incentives.

175.    Caplet Pharmacy has no right to receive payment for any pending bills submitted to GEICO for the Lidothol Patches and LidoPro Patches because it dispensed products that are medical unnecessary and specifically classified by the FDA as "unapproved" drugs or OTC products, which were illegally sourced from an unregistered drug supplier in violation of New York pharmacy laws.

176.    Caplet Pharmacy has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that Caplet Pharmacy dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

177.    Caplet Pharmacy has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Pharmacy Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals that were in many instances not actually delivered to the patients.

178.    The Pharmacy Defendants, including Caplet Pharmacy, violated New York State regulatory and licensing requirements, rendering the pharmacy ineligible to receive reimbursement for No-Fault Benefits.

179.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Pharmacy Defendants have no right to receive payment for any pending bills for the Fraudulent Pharmaceuticals submitted to GEICO through Caplet Pharmacy.

## THE SECOND CLAIM FOR RELIEF
**Against Masheyev**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

180.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

181.     Caplet Pharmacy is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

182.     Masheyev knowingly conducted and/or participated, directly or indirectly, in the conduct of Caplet Pharmacy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted thousands of fraudulent charges over a substantial period of time seeking payments that Caplet Pharmacy was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Caplet Pharmacy in exchange for unlawful kickbacks and other financial incentives; (iii) the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products that they dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; (iv) the Pharmacy Defendants dispensed and billed for Lidothol Patches and LidoPro Patches that were unnecessary, not approved by the FDA and/or are OTC only products, and unlawfully sourced from an unregistered pharmaceutical supplier; and (v) the Defendants billed for the Fraudulent Pharmaceuticals

allegedly dispensed by Caplet Pharmacy but in many instances did not actually deliver the products to the patients.   A representative sample of the fraudulent bills and corresponding mailings submitted through Caplet Pharmacy to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

183.   Caplet Pharmacy was created in May 2021 to engage in fraud.   In fact, Caplet Pharmacy's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Masheyev operated Caplet Pharmacy, inasmuch as Caplet Pharmacy never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Caplet Pharmacy to function.   Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Pharmacy Defendants continue to attempt collection on the fraudulent billing submitted through Caplet Pharmacy to the present day.

184.   Caplet Pharmacy is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants. These inherently unlawful acts are taken by Caplet Pharmacy in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

185.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $740,000.00 pursuant to the fraudulent bills submitted by the Pharmacy Defendants through Caplet Pharmacy.

186.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THE THIRD CLAIM FOR RELIEF
**Against Masheyev and John Doe Defendants "1" through "10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

187.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

188.    Caplet Pharmacy is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

189.    Masheyev and John Doe Defendants "1" through "10" are employed by or associated with the Caplet Pharmacy enterprise.

190.    Masheyev and John Doe Defendants "1" through "10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Caplet Pharmacy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted thousands of fraudulent charges over a substantial period of time that Caplet Pharmacy was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive

relationships in which the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Caplet Pharmacy in exchange for unlawful kickbacks and other financial incentives; (iii) the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products that they dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; (iv) the Pharmacy Defendants dispensed and billed for Lidothol Patches and LidoPro Patches that were unnecessary, not approved by the FDA and/or OTC products only, and unlawfully sourced from an unregistered pharmaceutical supplier; and (v) the Defendants billed for the Fraudulent Pharmaceuticals allegedly dispensed by Caplet Pharmacy but in many instances did not actually deliver the products to the patients. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1."

191.    Masheyev and John Doe Defendants "1" through "10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

192.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $740,000.00 pursuant to the fraudulent bills for the Fraudulent Services submitted through Caplet Pharmacy.

193.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THE FOURTH CLAIM FOR RELIEF
### Against Caplet Pharmacy, Masheyev and John Doe Defendants "1" through "10"
### (Common Law Fraud)

194.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

195.    Caplet Pharmacy, Masheyev and John Doe Defendants "1" through "10" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Caplet Pharmacy.

196.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that Caplet Pharmacy acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Pharmacy Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Caplet Pharmacy in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that Caplet Pharmacy acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Pharmacy Defendants intentionally targeted a specific set of pharmaceutical products that they could dispense in large volumes to Insureds with

exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; (iv) in every claim, the representation that Caplet Pharmacy acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Pharmacy Defendants dispensed and billed for Lidothol Patches and LidoPro Patches that were unnecessary, not approved by the FDA and/or OTC products only, and unlawfully sourced from an unregistered pharmaceutical supplier; and (v) in every claim, the representation that Caplet Pharmacy acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants billed for the Fraudulent Pharmaceuticals allegedly dispensed by Caplet Pharmacy but in many instances did not actually deliver the products to the patients.

197.    The Pharmacy Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Caplet Pharmacy that were not compensable under the No-Fault Laws.

198.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $740,000.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Pharmacy Defendants through Caplet Pharmacy.

199.    The Pharmacy Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

200.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE FIFTH CAUSE OF ACTION
### Against Caplet Pharmacy, Masheyev, and John Doe Defendants "1" through "10"
### (Unjust Enrichment)

201.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

202.    As set forth above, Caplet Pharmacy, Masheyev and John Doe Defendants "1" through "10" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

203.    When GEICO paid the bills and charges submitted by or on behalf of Caplet Pharmacy for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

204.    The Pharmacy Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Pharmacy Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

205.    The Pharmacy Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

206.    By reason of the above, the Pharmacy Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $740,000.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.      On the First Claim for Relief against Masheyev and Caplet Pharmacy, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Caplet Pharmacy has

no right to receive payment for any pending bills, amounting to more than $640,000.00 submitted to GEICO;

       B.      On the Second Claim For Relief against Masheyev compensatory damages in favor of GEICO in an amount to be determined at trial but more than $740,000.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

       C.      On the Third Claim For Relief against Masheyev and John Doe Defendants "1" through "10" compensatory damages in favor of GEICO in an amount to be determined at trial but more than $740,000.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

       D.      On the Fourth Claim for Relief against Caplet Pharmacy, Masheyev and John Doe Defendants "1" through "10," compensatory damages in favor of GEICO in an amount to be determined at trial but more than $740,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

       E.      On the Fifth Claim for Relief against Caplet Pharmacy, Masheyev and John Doe Defendants "1" through "10," a recovery in favor of GEICO in an amount to be determined at trial but approximately $740,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
       June 16, 2023

RIVKIN RADLER LLP

By:  _/s/ Michael A. Sirignano_

      Michael A. Sirignano
      Barry I. Levy
      Nadia Udeshi
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*